Charles E. HAYWARD, Secretary of the Department of Services for Children, Youth and Their Families, Defendant Below, Appellant,

v.

Robert and Jackie GASTON, Ronald and Connie Gearhart, James Faulkner, Harvey and Stephanie Reed, Seldon and Gladys Greene, David and Gail Lewis, Thomas and Rosemary Reynolds, Thomas Reynolds, Jr., Russell Greene, Margaret McGorman, Fred and Veronica Hensing, and William S. and Ruth Lewis, Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: Dec. 15, 1987.
Decided: May 27, 1988.

Richmond L. Williams, Deputy Atty. Gen., Dept. of Justice, Wilmington, for appellant.

N. Maxson Terry, Jr., Terry, Jackson, Terry & Wright, Dover, for appellees.

Brian J. Hartman, Disabilities Law Program, Community Legal Aid Society, Inc., Wilmington, for amici curiae, Delaware Developmental Disabilities Planning Council, Handicap Advocacy Network of Delaware, Inc., and New Castle County Alliance for the Mentally Ill.

Before CHRISTIE, C.J., and HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court *en banc.*

WALSH, Justice:

This is an appeal by Charles Hayward, Secretary of the State Department of Services for Children, Youth and Their Families ("Department"), from a decision of the Court of Chancery enjoining the Department from operating a residential treatment center ("RTC") for emotionally disturbed juveniles in an area known as Brenford in Kent County, Delaware. The injunction was granted at the request of certain Brenford residents who alleged that the establishment of the RTC in a building erected as a single family dwelling violated the Kent County Zoning Ordinance. In granting injunctive relief the Vice Chancellor, in a series of unreported decisions, including one rendered after remand from this Court, rejected the Department's contention that it was immune from the operation of the ordinance. He further ruled that the Department's proposed RTC was not permitted under the zoning ordinance. We conclude that the decision of the Court of Chancery is legally and evidentially sustainable and accordingly affirm. Because this appeal presents the first opportunity for this Court to address the question of governmental immunity in relation to local zoning regulations, we recite in detail the basis for our affirmance.

I

The factual background of this dispute is brief and uncontroverted although its procedural history in the Court of Chancery, and in this Court, has been somewhat extended. In early 1984, the Department leased a single family residence owned by Samuel and Gloria Anthony with the intention of using the dwelling, to be known as "Brenford Place," to house ten emotionally disturbed juveniles. The admission criteria for RTCs require that the residents have existing emotional and/or behavioral problems with the potential to benefit from treatment services in a residential setting. Before the Department was able to place any individuals in Brenford Place, appellee Gaston, along with other neighboring landowners, filed suit to enjoin the operation contending that the Department's proposed use was not permitted in an Agricultural–Conservation ("AC") district under the Kent County Zoning Ordinance. The Department promptly moved for summary judgment on the ground that its activities were not subject to local zoning ordinances.

In denying summary judgment the Court of Chancery held that: (1) the Department's use of Brenford Place as an RTC violated the Kent County Zoning Ordinance; and (2) the State is not immune from the provisions of the ordinance. The Chancery Court, however, ruled that a factual issue existed as to whether a statutory provision creating an exemption from Kent County's zoning authority for facilities housing developmentally disabled persons applied to Brenford Place.

Subsequently, trial was held to determine if the State's use of Brenford Place fell within the statutory exception. After hearing extensive expert testimony about the physical and mental condition of the expected residents, the Vice Chancellor concluded that the Department's use of Brenford Place did not qualify as the exception to the zoning ordinance. The court also rejected the State's claim that Kent County's zoning regulations violated the equal protection clause of the United States Constitution.

In an order dated September 22, 1986, the Court of Chancery permanently enjoined the State and the owners of the

property from using Brenford Place as an RTC. The parties, by stipulation, stayed the injunction pending the outcome of this appeal. The private landowners, the Anthonys, have not joined in the appeal from the Chancery Court's injunction. However, the Court has permitted three organizations, the Delaware Developmental Disabilities Planning Council, the Handicap Advocacy Network of Delaware, Inc. and the New Castle County Alliance for the Mentally Ill, all represented by the Community Legal Aid Society, Inc., to file a brief as *amici curiae* in support of the Department's appeal.

After initial briefing and argument, this Court directed a remand to the Court of Chancery to permit that court to make findings of fact concerning the appellees' contention that the Department had voluntarily subjected itself to local zoning requirements in other counties in the establishment of RTCs. After a hearing, the Court of Chancery concluded that although there did not appear to be "any announced general State policy" evidencing voluntary compliance with local zoning ordinances, the Department had, "as a matter of good public relations," attempted compliance in the location of RTCs in other instances. The Court noted that Brenford Place is the only example of a building which is in "apparent violation of a local zoning ordinance."

Despite its permutations, this appeal now requires this Court to address an issue of first impression: to what extent, and under what conditions, is the State, acting through its agencies, subject to zoning restrictions imposed by subordinate governmental entities? If such immunity is found not to exist in this case, we are required to determine if the Court of Chancery correctly ruled that the Department's proposed use of Brenford Place as an RTC is not permitted under the Kent County Zoning Ordinance.

## II

This case presents an instance of a clash of fundamental authority between two governmental entities, each attempting to exer-

cise sovereignty within its respective jurisdiction. The State, acting through the Department, seeks to implement the specific legislative policy of assisting and caring for emotionally disturbed adolescents committed to its charge. Kent County, whose interests are espoused by the appellee property owners, pursues an equally compelling interest, i.e., the regulation of land use under its zoning power, also at legislative direction.

The conflict between the intruding governmental use and local zoning restrictions has been resolved by the courts through a variety of methods. One approach, the so-called hierarchical test, resolves the issue in favor of the governmental entity in a position of greater sovereignty unless the legislature has expressly directed a contrary result. *See Aviation Services, Inc. v. Board of Adjustment,* 20 N.J. 275, 119 A.2d 761 (1956). Other courts have resolved such zoning disputes in terms of whether the proposed land use was "governmental" or "proprietary" in nature. If the intended use is in furtherance of a governmental function it will override local zoning ordinances while proprietary uses will not. *See City of Scottsdale v. Municipal Court of Tempe,* 90 Ariz. 393, 368 P.2d 637 (1962). A third, and often applied, test of governmental intrusion into zoning restrictions is the eminent domain approach. This standard posits immunity on whether the intruding governmental entity possesses the right of eminent domain, i.e., whether the governmental body has the right to condemn private property for the use in question. *Mayor of Savannah v. Collins,* 211 Ga. 191, 84 S.E.2d 454 (1954); *State v. Board of County Com'rs,* Ohio C.P., 79 N.E.2d 698 (1947), *aff'd,* 83 Ohio App. 388, 78 N.E.2d 694 (1948), *appeal dismissed,* 149 Ohio St. 583, 79 N.E.2d 911 (1948). Immunity has been deemed to exist based on the right to condemn even where the property has been acquired through negotiated purchase. *State v. Kopp,* Mo. Supr., 330 S.W.2d 882 (1960).

The traditional tests for resolving claims of overlapping governmental authority have most often resulted in the upholding

of state policies whenever those concerns conflict with laws and regulations adopted by subordinate political bodies such as counties and municipalities. *See* McQuillin, *Mun. Corp.* § 25.15 (3rd Ed. 1983). These rules, with their heavy emphasis on the attributes of sovereignty, have been criticized as overlooking the central question of whether the proposed use or its restriction best serves the public interest. *See* Note, *Governmental Immunity From Local Zoning Ordinances*, 84 Harv. L. Rev. 869 (1971).

Dissatisfaction with the earlier approach to the sovereignty issue has led to the development of new standards, the most prominent of which is the so called balancing of interests test first articulated by the New Jersey Supreme Court in *Rutgers, State University v. Piluso*, 60 N.J. 142, 286 A.2d 697 (1972). In ruling that the growth and development of a public university should not be thwarted by local land use regulations, the court fashioned a balancing of governmental interests analysis. The court rejected the traditional approaches as simplistic and categorized, emphasizing instead the need for individual analysis to determine which governmental interest should prevail based on "the particular relationship and factual situation" involved. *Id.*, 286 A.2d at 701. The court began its analysis with the statement that the judicial task involves a search for legislative intent which is "rarely specifically expressed." *Id.* 286 A.2d at 702. In seeking to divine legislative intent by implication in the face of two inconsistent enabling acts which lend plausible support to the respective positions of the competing governmental entities, the reviewing court is required to make a value judgment which extends beyond a determination of superior sovereignty.

All possible factors cannot be abstractly catalogued. The most obvious and common ones include the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon le-

gitimate local interests. In some instances one factor will be more influential than another or may be so significant as to completely overshadow all others. No one, such as the granting or withholding of the power of eminent domain, is to be thought of as ritualistically required or controlling. And there will undoubtedly be cases, as there have been in the past, where the broader public interest is so important that immunity must be granted even though the local interests may be great. The point is that there is no precise formula or set of criteria which will determine every case mechanically and automatically.

*Id.* 286 A.2d at 702–703 (citations omitted).

Finally, the court in *Rutgers* concluded that if immunity is conferred through implied legislative intent, the exercise of that immunity is qualified.

It is, however, most important to stress that such immunity in any situation is not completely unbridled. Even where it is found to exist, it must not, ... be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests. This rule must apply to the state and its instrumentalities as well as to lesser governmental entities entitled to immunity.

*Id.* 286 A.2d at 703.

The *Rutgers* standard has been applied to limit the authority of a State Department of Transportation from establishing a heliport without consulting with local authorities and considering the effect of local zoning ordinances, *Garden State Farms, Inc. v. Bay*, 77 N.J. 439, 390 A.2d 1177 (1978), and to restrain a State Department of Corrections from establishing a group home for juvenile delinquents in an area zoned for residential use. *Pemberton Tp. v. State*, 171 N.J.Super. 287, 408 A.2d 832 (Law 1979). Under the *Rutgers* immunity analysis, however, the need for a juvenile rehabilitation center was found to outweigh the inconvenience to a single neighbor. *Farrell v. Estell Manor Zoning Bd. of Adj.*, 193 N.J.Super. 554, 475 A.2d 94, 96 (Law 1984).

The balancing of interests test has also been adopted in other jurisdictions and is generally regarded as the most enlightened approach to resolving zoning immunity disputes between competing governments. *See Independent School Dist. v. Oklahoma City,* Okl. Supr., 722 P.2d 1212 (1986); *City of Crown Point v. Lake County,* Ind. Supr., 510 N.E.2d 684 (1987); *see also* Note, *Governmental Immunity from Zoning,* 22 B. C. L. Rev. 783 (1981).

The balancing of interests test is not without its critics. It has been rejected as "too nebulous and judicially unmanageable," *Macon Ass'n for Retarded Cit. v. Macon–Bibb,* 252 Ga. 484, 314 S.E.2d 218, 223 (1984), in favor of the principle that immunity from local zoning may not be found to exist "in the absence of a clear expression" of legislative intent. *Id.* Other courts have pursued the immunity analysis beyond the *Rutgers* standard by extending judicial review to permit a broader balancing of equities based on all policies and interests implicated by the immunity claim, and, in effect, requiring submission to local zoning authorities in all cases where there is no express legislative grant of immunity. *See City of Temple Terrace v. Hillsborough Ass'n. v. Retarded Citizens, Inc.,* Fla. App., 322 So.2d 571 (1975), *aff'd,* Fla. Supr., 332 So.2d 610 (1976). *See also City of Fargo v. Harwood TP.,* N.D. Supr., 256 N.W.2d 694 (1977).

In rejecting the Department's claim that it was immune from local zoning control, the Court of Chancery used the "double test" applied in an earlier decision of that court in *City of Newark v. University of Delaware,* Del. Ch., 304 A.2d 347 (1973), which, in turn, appears to have adopted the *Rutgers* approach. In *City of Newark,* the court was required to determine whether the University of Delaware was subject to a Newark zoning ordinance. Applying the *Rutgers* analysis, the court held that the "[l]egislature intended that the University in its growth and development should not be subject to the restriction or control by local land use regulations." *Id.* at 349.[1] Notwithstanding the determination that the legislative grant of immunity was "expressly evidenced," the court in *City of Newark* nonetheless ruled that such immunity might not be absolute if "the City in a given instance can show that its exercise is unreasonable or arbitrary." *Id.*

Despite his reliance on what we view as an unwarranted application of a reasonableness standard in *City of Newark,* the Vice–Chancelor correctly tested the Department's claim of immunity under a *Rutgers*-type analysis. After noting that Kent County exercises its zoning power under a broad legislative grant of authority, 9 *Del. C.* § 4901,[2] which does not purport to ex-

---

1. In *City of Newark* the legislative intent of exclusive control was found in 14 *Del.C.* § 5106 which provides, in pertinent part:

   Notwithstanding any provisions appearing elsewhere in the laws of this State which might suggest or provide the contrary, the entire control and management of the affairs of the University, which is conferred upon the Board of Trustees by the foregoing paragraph, shall be construed ... as including ... the following powers and duties: ... the planning for buildings and improvements and the extension or diminution of the campus or other land holdings are matters wholly under the control of the Trustees except where inspection or regulations may be provided for by law in respects involving the health or safety of the occupants of the buildings.

   We view this legislative grant of immunity from local zoning regulations as a clear expression of legislative intent, rendering unnecessary a search for implied immunity, and precluding the need to apply the final tier of the *Rutgers* analysis which seeks to determine whether the qualified immunity was lost because the immune agency acted unreasonably or arbitrarily. To this extent we believe the decision in *City of Newark* to be flawed.

2. 9 *Del.C.* § 4901 provides:

   **§ 4901. Power of county government; area subject to regulation.**

   The county government may, in accordance with the conditions and procedure specified in this chapter, regulate the location, height, bulk and size of buildings and other structures, the percentage of lot which may be occupied, the size of yards, courts, and other open spaces, the density and distribution of population, the location and uses of buildings and structures for trade, industry, residence, recreation, public activities or other purposes, and the uses of land for trade, industry, residence, recreation, public activities, water supply conservation, soil conservation, or other similar purposes, in any portion or portions of Kent County which lie outside of incorporated municipalities, or incorporated munici-

empt State agencies, the court proceeded to assess the reasonableness of the Department's action; the final tier of the *Rutgers* analysis. Since the Department conceded that it made no effort to contact Kent County authorities before proceeding with its RTC, the court concluded that the Department did not act reasonably and was thus "not immune."

The Department argues that this Court, facing the zoning immunity question as one of first impression, should not adopt the *Rutgers* rationale applied by the Court of Chancery. Instead the Department urges that governmental clashes over zoning should be resolved through the hierarchical approach, which provides that unless the greater sovereign has expressly waived immunity its activities are not subject to local zoning control. *See* Note, *Governmental Immunity from Zoning*, 22 B.C.L. Rev. 783, 787 (1981). Under this approach, the State thus shifts to its opponent the burden of demonstrating a waiver of immunity. Alternatively, the Department contends that even if a *Rutgers* analysis is appropriate the legislative history of the Department's operations and funding evidence a legislative intent of immunity.

We find that the hierarchical approach to land use disputes between competing governmental entities, as urged by the Department, is both simplistic and archaic. The principle of sovereign immunity, which is not judicially created but established by the State Constitution, finds ready application in disputes between governmental entities and private individuals. *Doe v. Cates*, Del. Supr., 499 A.2d 1175, 1181 (1985). The doctrine is supported by the rationale that the State must not be unduly restricted in its governmental functioning by claims which it has not agreed to entertain through waiver or by contract. *Dept. of Community Affairs v. M. Davis & Sons, Inc.*, Del. Supr., 412 A.2d 939 (1980); *George & Lynch, Inc. v. State*, Del. Supr., 197 A.2d 734 (1964). The regulation of land use through zoning and building regulations, however, has not been traditionally

a matter of State concern in Delaware. The General Assembly through grants of home rule has ceded primary responsibility for land use control to county and municipal governments. *See, e.g.,* 9 *Del.C.* §§ 2601, 4901, 6902; 22 *Del.C.* § 301.

▮ In this delegation of its power over land use, the General Assembly, in effect, has surrendered that incident of its sovereignty to subordinate governmental entities. Thus, the counties, as well as departments of State government, can also claim to be agents of the State in the discharge of the sovereign's power to regulate land use. Whether in a specific instance the General Assembly has expressly or by implication granted immunity to State agencies and departments from local land use regulation is a question to be resolved on a case-by-case basis. In the absence of a specific legislative expression such a determination must be made without the artificial constraints of hierarchical structures.

▮ Because the *Rutgers'* balancing of interests approach offers an objective review of the public policy interests which are implicated in governmental land use when the legislative intent is unclear, we adopt it as the standard for judicial review. We recognize that where the legislature has spoken in express terms to grant immunity to a State agency an examination into the competing governmental interests is unnecessary. Moreover, in that instance, the immunity granted expressly by the legislature will be respected and is not subject to the qualification of reasonableness even if the result is harsh and the assertion of immunity disruptive of local concerns. But where, as here, the legislative directives are open to varying interpretations and the positions of both the intruding governmental agency and the local land use authority find legislative support, the determination of legislative intent on the issue of immunity is best reached through a balancing of interests analysis.

palities without zoning provisions, notwithstanding any provisions of other titles or

chapters of this Code to the contrary.

■ The Department argues that the Court of Chancery's analysis into the reasonableness of the Department's conduct was incomplete because the court failed to apply the balancing test as contemplated in *Rutgers* and because the court's conclusions were based on a limited summary judgment record. While we agree that initially the Vice Chancellor reached the finding of unreasonableness in a summary judgment context, the record as developed on remand, particularly the evidence that the Department consulted with local zoning authorities in planning similar group homes in New Castle County, fully justifies the conclusion that the Department acted unreasonably in failing to consider the concerns of local zoning authorities or adjacent property owners in Kent County.

In addition, in this case it was not necessary for the Court of Chancery to apply the balancing of interests test to determine if the Department enjoyed implied immunity. Under a balancing test the Department could have achieved only a qualified immunity, subject to it exercising that immunity in a reasonable fashion. *See Rutgers v. Piluso,* 286 A.2d at 703. Thus, even though a full balancing of interests analysis was not applied here, the record is sufficient to support the Vice Chancellor's conclusion that the Department acted unreasonably and, was not immune from the Kent County Zoning Ordinance. *See Pemperton TP. v. State,* 408 A.2d at 839 (citing *Rutgers v. Piluso,* 286 A.2d at 703).[3]

■ Finally, the Department argues that 29 *Del.C.* § 9018,[4] entitled "Supremacy of Chapter," passed subsequent to 9 *Del.C.* Ch. 49, illustrates the legislature's intent that all prior relevant laws affecting RTCs, i.e., the Kent County Zoning Ordinance, must be subordinated to and preempted by Chapter 90. The Department's argument is not persuasive. None of the statutes found in chapter 90 are inconsistent with the Kent County Zoning Ordinance. Chapter 90 merely grants the Department the power and duty to establish and operate RTCs. County zoning authority does not in any way hinder the objectives of chapter 90, rather, it simply regulates their location. As such, the Kent County's zoning authority is not superseded by the Department's power to establish RTCs.

### III

■ In light of our conclusion that the Department is not immune from the Kent County Zoning Ordinance, we are required to review the Vice Chancellor's finding that the Department's proposed use of Brenford Place as an RTC violates the provisions of the zoning ordinance. The Department makes two arguments in support of its claim of compliance: the first is based on statutory construction and the second addresses the substance of the ordinance.

It is undisputed that Kent County's A–C district zoning permits only "detached single family dwellings." The zoning code defines a single family dwelling as "[a] building designed for or occupied exclusively by one family." The Department argues that because the ordinance uses the disjunctive "or", the language must be construed to mean that if a building is originally designed to be used exclusively by one family it may subsequently be used for other purposes.

---

3. The limited application of the *Rutgers* test is attributable, in part, to the absence of Kent County as a party in these proceedings. The case arose on a petition for injunctive relief by individual property owners who became, in effect, the County's surrogate in attempting to enforce the County's zoning ordinance. A balancing of interests analysis is best performed in a direct contest between the intruding government and the resisting zoning authority, with the intruding government, for example, seeking a variance for its proposed use. *See, Garden State Farms, Inc. v. Bay,* 390 A.2d at 1185. Judicial review of actions on the variance permits the reviewing court to examine the competing governmental policies at issue as well as consider the sometimes separate concerns of objecting property owners. A variance request, in itself, is an indication that the intruding governmental entities respects the underlying purpose of zoning regulation.

4. 29 *Del.C.* § 9018 provides:
   All other laws or parts of law now in effect inconsistent with this chapter are hereby repealed, superseded, modified or amended so far as necessary to conform to and give full force and effect to this chapter.

■ The Department's literal reading of the ordinance produces a strained result. If a literal interpretation of a statute leaves a result inconsistent with the general statutory intention, such interpretation must give way to general intent. As such, under the rules of statutory construction our task is to ascertain the purpose and intent of the legislature. *See Richardson v. Wile,* Del. Supr., 535 A.2d 1346, 1348 (1988); *Home Insurance Co. v. Maldonado,* Del. Supr., 515 A.2d 690 (1986); *Mayor and Council of Wilmington v. Dukes,* Del. Supr., 157 A.2d 789 (1960). To that end, we must give a "sensible and practical meaning to the statute as a whole...." *Burpulis v. Director of Revenue,* Del. Supr., 498 A.2d 1082, 1087 (1985) (citing *Nationwide Mutual Insurance Co. v. Krongold,* Del. Supr., 318 A.2d 606, 609 (1974)).

■ In this case, the general intent and purpose of the ordinance is clear. It is, as the Chancery Court correctly found, to limit dwellings in an AC District to those used as single family dwellings. *See Application of Emmett S. Hickman Co.,* Del. Supr., 108 A.2d 667 (1954). To adopt the Department's literal interpretation would contravene this intent because a dwelling originally designed for use by the family could later be used for multifamily habitation or even for commercial purposes—a clearly unintended result. *See Nationwide Mutual Insurance Co.,* 318 A.2d at 609. Thus, the Department's literal interpretation must give way to the statute's general intent.

■ The Department argues that the juveniles residing at Brenford Place constitute a family for the purpose of the zoning code, and, in any event, the ordinance's definition of family is invalid because it is not reasonably related to any legitimate governmental objective.

"Family" is defined in the Kent County Zoning Code as:

An individual or two or more persons who are related by blood or marriage living together and occupying a single housekeeping unit with single culinary facilities, or as a group of not more than four persons living together by joint agreement and occupying a single housekeeping unit with single culinary facilities or a non-profit, costsharing basis. Domestic servants, employed and residing on the premises, shall be considered as part of the part of the family.

The Chancery Court ruled that the Department's proposed use of Brenford Place violates the ordinance for the simple reason that more than four unrelated persons will be living in the same house. The Department and the amici, citing cases in other jurisdictions where the courts have liberally interpreted the definition of family for zoning purposes, seek to circumvent the numerical limitation. These cases are inapposite because they involve ordinances which either do not define family, define it differently, or fail to specify a maximum number of unrelated persons who could live together. *See, e.g., Costley v. Caromin, House, Inc.,* Minn. Supr., 313 N.W.2d 21 (1981) (no limit on number of unrelated persons who may live together); *Bellarmine Hills Ass'n v. Residential Systems Co.,* 84 Mich.App. 554, 269 N.W.2d 673 (1978) (same). Moreover, "where a zoning ordinance has expressly defined the meaning of the term 'family,' the stated definition is controlling." *Linn County v. City of Hiawatha,* Iowa Supr., 311 N.W.2d 95, 99 (1981). This approach finds support in other jurisdictions. *See, e.g., Normal Life of Louisiana, Inc. v. Jefferson Parish Dept. of Inspection & Code Enforcement,* La. App., 483 So.2d 1123 (1986); *Provo City v. Hansen,* Utah Supr., 585 P.2d 461 (1978). Thus the Court of Chancery correctly ruled that the numerical limitation in the Kent County Zoning Ordinance's definition of "family" is controlling and, as such, the Department's intended use is not permitted.

■ The Department next contends that if the residents of Brenford Place do not meet the criteria of "family" as provided in the ordinance, then the ordinance must be declared invalid because the statutory criteria are not rationally related to a permissible state interest. *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Tate v. Miles,*

Del.Supr., 503 A.2d 187 (1986); *Willdel Reality, Inc. v. New Castle County*, Del. Supr., 281 A.2d 612 (1971). While we agree that a zoning restriction must be substantially related to the public health, safety or welfare, *Mayor & Council v. Rollins Outdoor Advertising*, Del.Supr., 475 A.2d 355, 359 (1984), we find that standard to be met in this case.

■ As an attribute of governmental authority, zoning is a legislative function, *County Council of Sussex Cty. v. Green*, Del. Supr., 516 A.2d 480, 481 (1986), and is presumed to be valid unless shown to be arbitrary or capricious. *Willdel Realty Inc. v. New Castle County*, 281 A.2d at 614. The burden of rebutting the presumption of validity rests with the party challenging the zoning. *Id.* Here the Department has failed to meet its burden. The Kent County Zoning Ordinance's definition of "family" is rationally related to limiting population density and minimizing noise and traffic associated with a large number of unrelated persons living together. *See Village of Belle Terre v. Boraas*, 416 U.S. at 9, 94 S.Ct. at 1541. *See also* 9 *Del.C.* § 4903. In the absence of arbitrary action, a reviewing court is not permitted to substitute its judgment for what is essentially a policy determination under the county's zoning power. *See Green v. County Planning and Zoning Com'n of Sussex Cty.*, Del. Ch., 340 A.2d 852 (1974), *aff'd sub nom, Sea Colony Inc. v. Green*, Del. Supr., 344 A.2d 386 (1975); *Dukes v. Shell Oil Company*, Del. Ch., 177 A.2d 785 (1962).

### IV

■ Apart from its claims of general sovereign immunity the Department sought to persuade the Court of Chancery that its proposed use of Brenford Place was a permitted single family residential use by reason of a specific superseding statute. The Department relies upon the statutory exemption conferred by 9 *Del. C.* § 4923 which provides in pertinent part:

**§ 4923. Residential facilities for developmentally disabled persons.**

(a) For purposes of all county zoning ordinances a residential facility licensed or approved by a state agency serving 10 or fewer developmentally disabled persons on a 24-hour-per-day basis shall be construed to be a permitted single family residential use of such property.

(b) For purposes of this section a developmentally disabled person is a person with a disability resulting in substantial functional limitations in a person's major life activities attributable to mental retardation, cerebral palsy, epilepsy or autism, attributable to any other condition found to be closely related to mental retardation because such condition results in similar impairment of general intellectual functioning or adaptive behavior to that of mentally retarded persons or requires treatment and services similar to those required for such persons, or attributable to a physical impairment.

The Vice Chancellor held an evidentiary hearing during which the parties introduced conflicting evidence regarding the definition of "developmentally disabled." He concluded that none of the juveniles proposed for placement in Brenford Place had been diagnosed as developmentally disabled, i.e., impaired in their intellectual functioning or adaptive behavior "closely related to mental retardation." He rejected the Department's attempt to equate the behavioral problems associated with mental illness with developmental difficulties resulting from mental impairment, noting that the proposed residents of Brenford Place are "for the most part, truants, alcohol and drug abusers, sexually promiscuous, runaways, suicidal, or have committed crimes." *Gaston v. Schramm*, Del. Ch., No. 825, slip op. at 5 (July 8, 1986) [available on WESTLAW, 1986 WL 7613].

The Department argues that the Chancery Court incorrectly interpreted the statute's meaning of "closely related" or "similar to" mental retardation. We disagree. The Chancery Court, as the finder of facts, weighed the expert testimony concerning what conditions constitutes "closely related" or "similar to" mental retardation. The statute was obviously intended to per-

mit persons with disabilities attributable to intellectual or physical impairment to function in a family or residential setting in order to aid in their adjustment and development. Persons whose behavior is characterized by anti-social and criminal activities pose special security risks which cannot be addressed in a residential setting. On the evidence presented and given our limited scope of review we cannot conclude that the Chancery Court's findings are not the product of an orderly and deductive process. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972).

## V

As their final argument both the Department and the *amici* contend that it is a denial of the equal protection clause of the United States Constitution if 9 *Del.C.* § 4923 is construed to exempt group homes for the mentally retarded from local zoning restrictions without also exempting group homes for the mentally ill. These parties rely upon the decision of the U.S. Supreme Court in *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), as support for their constitutional argument.

In *City of Cleburne,* the local zoning ordinance required a special permit for a group home for the mentally retarded, but did not require such a permit for other group homes. In striking down the ordinance on equal protection grounds, the Court ruled that the city was not able to demonstrate any legitimate governmental interest in treating the mentally retarded differently from other groups. *Id.* 105 S.Ct. at 449–50. This is not the situation here.

■■■■ The Kent County Zoning Ordinance does not discriminate against the mentally retarded. The A.C. Zoning District does not permit *any* group homes, whether the proposed occupants be disabled or not. Moreover, section 4923 confers a special benefit upon the mentally retarded, i.e., the right to live in group homes in a residential district, a right enjoyed by no other group. In granting a special benefit to a limited group through

section 4923, the General Assembly was not required to confer such a benefit upon all groups irrespective of their special needs.

The judgment of the Chancery Court is AFFIRMED.